**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| MARK BROCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case. No. 2:14-cv-00170-JMS-MJD |
| | ) | |
| WILLIAM WILSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Discussing Motion for Summary Judgment**

Plaintiff Mark Brock ("Mr. Brock"), a federal prisoner incarcerated at the Gilmer Federal Correctional Facility, in Glenville, West Virginia, brings this action pursuant to *Bivens* v. *Six Unknown Named Agents*, 403 U.S. 388 (1971), and the Federal Tort Claim Act ("FTCA"). He alleges that the defendants were deliberately indifferent to his serious medical condition of aggressive fibromatosis in violation of the Eighth Amendment and were negligent when they delayed treating his condition, which constituted medical malpractice. Defendants Dr. William Wilson, Dr. Roger Jones, Alex Jastillano, Dr. Allen, and the United States of America moved for summary judgment. The plaintiff filed a response in opposition and the defendants have replied. For the following reasons, the motions for summary judgment [Dkt. 136, 138] are **granted.** [1]

## I.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible

---

[1] The Court acknowledges its gratitude to Messrs. Cody, Holdridge, and Beyers for their efforts on behalf of Mr. Brock.

evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Fed. R. Civ. P.* 56(e)(2). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *Harney v. Speedway Super America, LLC.*, 526 F.3d 1099, 1104 (7th Cir. 2008). The non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II.  Statement of Material Facts Not in Dispute[2]

### A. Background

Mr. Brock was incarcerated at the Federal Correctional Institution - Terre Haute, Indiana, ("FCI-Terre Haute") from August 30, 2007, until November 11, 2014. Mr. Brock alleges in his amended complaint that, beginning in 2007, he was treated for recurrences of aggressive fibromatosis. [Dkt. 89]. Fibromatosis (also known as desmoid tumors) is a rare condition that occurs when fibroblasts, the cells that provide structural support to, and protection of, the body's vital organs, undergo mutations and begin to grow uncontrollably. [Dkt. 136-5, ¶ 4]. They can be

---

[2] The Statement of Material Facts Not in Dispute and exhibits are identical for the individual defendants and defendant United States of America. [Dkts. 136, 138].

slow growing or extremely aggressive. [Dkt. 151-2, at p. 13]. The tumors associated with fibromatosis, however, do not metastasize (move from one part of the body to another). [Dkt. 136-5, ¶ 4]. Aggressive fibromatosis does not respond well to radiation or chemotherapy and is generally treated surgically. [Dkt. 151-2, at p. 3]. General surgeons do not like to operate on desmoid tumors and more specialized surgeons are often required. [Dkt. 136-5; 138-5; 151-2, at p. 3]. Genetics often determine whether a desmoid tumor is slow growing or aggressive in its growth. Initial treatment for a desmoid slow growing tumor is to monitor and observe. [Dkt. 151-2, at p. 4]. However, when a desmoid tumor causes pain or the tumor grows enough, surgery is necessary. [Dkt. 151-2, at p. 6].

## B. Terre Haute Medical Facility

In March of 2011, Mr. Brock underwent surgery to remove a cyst on the left side of his rib cage. [Dkt. 151-2, at p. 17]. Defendant Dr. William Wilson is the clinical director at FCI-Terre Haute. As the clinical director, his job is half administrative and half clinical. [Dkt. 151-1, at p. 12]. The medical facility has approximately 5 physician assistants and Dr. Wilson must cosign their notes. If an inmate needs an outside referral, the process is conducted through the utilization review committee. [Dkt. 151-1, at p. 28]. NaphCare is a third-party entity that schedules outside consultations for the facility and is present during the utilization review committee meetings. NaphCare then sets up the outside consultations for the inmates. Dr. Wilson relies on NaphCare to make the outside appointments [Dkt. 150-1, at pp. 28, 30, 42].

## C. Tumor Growth

On November 9, 2011, Mr. Brock saw Bureau of Prison ("BOP") physician Dr. Roger Jones at the Chronic Care Clinic- FCI-Terre Haute. Dr. Jones summarized Mr. Brock's history of fibromatosis and noted that Mr. Brock had a chest wall mass and two ribs removed in March of

2011. Dr. Jones observed that Mr. Brock had a "new 2-3 cm nodule on [the] left anterior chest wall." He submitted a request for Mr. Brock to see an oncologist. [Dkt. 136-6; 136-7, pp. 1, 6].

Mr. Brock saw contract oncologist Dr. Ryan Gonzales on December 22, 2011. Dr. Gonzales ordered CT scans of Mr. Brock's chest, abdomen, and pelvis, and stated that Mr. Brock needed to follow up with Dr. Daniel Meldrum, the cardiothoracic surgeon at Methodist Hospital in Indianapolis who performed Mr. Brock's surgery in March of 2011. [Dkt. 136-6, ¶ 9; 136-8]. The CT scans ordered by Dr. Gonzales were performed five days later, on December 27, 2011. [Dkt. 136-6, ¶ 10; 136-9]. The CT scan revealed a deformity of the left upper anterior chest wall affecting the left second anterior rib. [Dkt. 136-8].

On January 17, 2012, Mr. Brock had a follow up appointment for a recurrent soft tissue mass with Dr. Meldrum. [Dkt. 136-6, ¶ 11; 136-10].

On February 10, 2012, Mr. Brock saw PA Alex Jastillano at the Chronic Care Clinic. Mr. Brock complained of a "recurring hard mass in his left chest area which he said had grown bigger." PA Jastillano noted that Mr. Brock had recently been seen by Dr. Meldrum but the results of that consultation were not yet in the system. Mr. Brock stated that Dr. Meldrum told him that he would "need another surgery in the near future." Because Dr. Meldrum was moving out of state, PA Jastillano placed a request for Mr. Brock to see a different cardiothoracic surgeon. [Dkt. 136-6, ¶ 12; 136-11]. PA Jastillano noted the mass measured approximately 1.5 centimeters in diameter. [Dkt. 136-11].

On April 16, 2012, Mr. Brock saw cardiothoracic surgeon Dr. David Hormuth at Methodist Hospital in Indianapolis. After reviewing Mr. Brock's December of 2011, CT scan, Dr. Hormuth concluded that "there did not appear to be any significant masses" and the "soft tissue firmness" that Dr. Hormuth observed during his examination "may be related to radiation changes" or

4

postsurgical scar tissue. Accordingly, Dr. Hormuth ordered additional CT scans and stated that after he reviewed the CT scans, if he felt that Mr. Brock needed further follow up, he would "contact [the prison] directly." [Dkt. 136-6, ¶ 13; 136-12].

On May 8, 2012, Mr. Brock saw BOP physician Dr. Klint Stander at the Chronic Care Clinic. Dr. Stander noted that Mr. Brock's chief complaint was "pain of the left rib cage, left shoulder, and left arm and hand." Mr. Brock also complained about a 3 centimeter lump in the upper outer quadrant of the left breast area. Dr. Stander scheduled Mr. Brock for a chest CT. [Dkt. 136-6, ¶ 14; 136-13].

Mr. Brock had the CT scan ordered by Drs. Hormuth and Stander on June 5, 2012. The CT scan revealed "enlargement of the left breast with a mass lesion" and the radiologist recommended "appropriate additional evaluation." [Dkt. 136-6, ¶ 15; 136-14].

PA Jastillano reviewed the report from the June 5, 2012, CT scan on June 22, 2012, and noted that there was "an enlargement of the left breast mass with a mass lesion." Accordingly, PA Jastillano referred Mr. Brock to Dr. Nabil Mnayarji, a cardiothoracic surgeon in Terre Haute, for evaluation and a biopsy. [Dkt. 136-6, ¶ 16; 136-15].

On August 8, 2012, BOP physician Dr. Tom Bailey saw Mr. Brock to evaluate his chest mass. Dr. Bailey noted that "over . . . the last 5 months [Mr. Brock] has developed another mass which has rapidly grown in size just below the site of the last tumor." Dr. Bailey noted the mass will require excision and should be removed as soon as practicable and it caused Mr. Brock pain. Dr. Bailey noted the mass had grown to a size of approximately 4 x 10 centimeters. [Dkt. 136-6, ¶ 18; 136-17].

On August 29, 2012, Mr. Brock saw cardiothoracic surgeon, Dr. Nabil Mnayarji. Dr. Mnayarji requested another CT scan to "evaluate the mass and location" and requested to review

the "pathology report from the 2nd procedure which was done at Indiana University Medical Center." Dr. Mnayarji stated that once the imaging was completed and the pathology report was reviewed, he would "re-evaluate the condition and recommend the appropriate treatment for [Mr. Brock]." [Dkt. 136-6, ¶ 19; 136-18].

On September 14, 2012, Mr. Brock saw PA Jastillano at the Chronic Care Clinic. Mr. Brock was "anxious, with poor behavioral control" and PA Jastillano speculated that Mr. Brock was upset because his Gabapentin and Percocet had been discontinued in July after Mr. Brock was caught passing the medications to another inmate.

On October 31, 2012, Mr. Brock asked BOP nurse Danna Dobbins whether he was scheduled for surgery. Nurse Dobbins reviewed Dr. Mnayarji's report which "suggested [a] CT of chest then follow up." Nurse Dobbins ordered a chest CT and placed a request for Mr. Brock to see Dr. Mnayarji after the chest CT was completed.  [Dkt. 136-6, ¶ 21; 136-20].

On November 16, 2012, Mr. Brock saw Clinical Director Dr. William Wilson at the Chronic Care Clinic. Mr. Brock's primary issue that day was "a recurrence of [his] chest mass lesion left breast." Although Mr. Brock had seen Dr. Mnayarji less than 2 months earlier, Mr. Brock insisted that he "need[ed]" to see Dr. Hormuth, the cardiovascular surgeon in Indianapolis. Initially, Dr. Wilson ordered a repeat chest CT and made a note to "get [Mr. Brock] to [cardiovascular] surgeon possibly who performed his last procedure in Indianapolis as soon as possible." However, upon further review of the records, Dr. Wilson discovered that Mr. Brock already had an appointment scheduled with Dr. Mnayarji, so Dr. Wilson instructed the schedulers to keep that appointment and to schedule Mr. Brock for follow up with Dr. Wilson.  [Dkt. 136-6, ¶ 22; 136-21].

Four days later, on November 20, 2012, Mr. Brock had a chest CT which revealed a "new 3.5-4.3 cm soft tissue mass" in Mr. Brock's left breast.  [Dkt. 136-22]. On or about December 18, 2012, Mr. Brock had another appointment with cardiothoracic surgeon Dr. Mnayarji. [Dkt. 136-6, ¶ 24]. After the appointment with Dr. Mnayarji, PA Jastillano noted that Dr. Mnayarji wanted Mr. Brock "followed up in house by the general surgeon." [Dkt. 136-23].

On December 21, 2012, Mr. Brock and Dr. Wilson discussed Dr. Mnayarji's recommendation that Mr. Brock follow up with the "general surgeon who comes inside the prison." Dr. Wilson explained that he had placed a request for Mr. Brock to see someone in the Indianapolis surgical group that had performed Mr. Brock's March of 2011 surgery because "no local surgeons appear willing or able to perform further surgery." [Dkt. 136-24].

On February 27, 2013, Mr. Brock saw BOP Regional Medical Director Dr. Paul Harvey at the Chronic Care Clinic. Dr. Harvey concluded that Mr. Brock should be transferred to a BOP medical facility because no surgeons in Terre Haute or Indianapolis were willing to operate on Mr. Brock.

On March 1, 2013, Dr. Harvey and Dr. Wilson placed a request to transfer Mr. Brock to a BOP medical facility. Drs. Harvey and Wilson noted that Mr. Brock had a "3.5 x 4.3 soft tissue mass" and that they "ha[d] been unable to obtain a biopsy as both the local surgical staff in Terre Haute and [the surgical staff in] Indianapolis [were] unwilling to biopsy the lesion." [Dkt. 136-6, ¶ 27; 136-26].

On March 22, 2013, Dr. Wilson learned that the request to transfer Mr. Brock to a BOP medical center had been denied because Mr. Brock could not be transferred without a "tissue diagnosis." After discussion with Dr. Brett Guinn, a general surgeon in Terre Haute, Dr. Wilson

convinced Dr. Guinn to perform a needle biopsy so that Dr. Wilson could obtain the required tissue diagnosis. [Dkt. 136-6, ¶ 29; 136-28].

On March 27, 2013, Dr. Wilson informed Mr. Brock that Dr. Guinn would be performing a needle biopsy of Mr. Brock's chest mass. That day, Dr. Wilson increased Mr. Brock's Percocet from 1 pill per day to 2 pills per day to help manage Mr. Brock's discomfort.  [Dkt. 136-6, ¶ 30; 136-29]. Dr. Guinn performed a needle biopsy of Mr. Brock's chest mass on April 16, 2013. [Dkt. 136-30].  The pathology results confirmed that the mass was "recurrent fibromatosis." [Dkt. 136-6, ¶ 31].

On May 9, 2013, Dr. Wilson arranged for Mr. Brock to see general surgeon Dr. Katie Stanton-Maxey at Indiana University Medical Center in Indianapolis.  [Dkt. 136-6, ¶ 32].

On May 23, 2013, Mr. Brock informed Health Services staff member Krysti Jackson that he was in excruciating pain because of the knots in his chest. [Dkt. 136-33].

On June 6, 2013, Mr. Brock saw PA Jastillano at the Chronic Care Clinic.  PA Jastillano noted a mass the size of a baseball and informed Mr. Brock that he was "scheduled to see [a] specialist [at IU]." [Dkt. 136-34]. Mr. Brock stated he was experiencing pain in his rib cage area. [Dkt. 136-6, ¶ 34].

On June 7, 2013, Mr. Brock submitted a Notice of Tort Claim alleging that the Health Services staff at USP Terre Haute had engaged in "medical neglect" in their treatment of his fibromatosis. [Dkt. 136-1; 136-3].

Mr. Brock saw Dr. Stanton-Maxey on July 16, 2013. She reviewed Dr. Hormuth's earlier notes and stated "Dr. Hormuth's notes in 4/2012 and 08/2012 report a CT scan on 06/05/2012 that, upon Dr. Hormuth's review, did not appear to have evidence of recurrent disease involving the chest wall. There was felt to be enlargement of the left breast tissue with possible mass lesion that

8

may be gynecomastia or other breast mass. Therefore, the patient was discharged from Dr. Hormuth's care with a recommendation to follow up with a general surgeon." [Dkt. 136-35].

Upon examination, Dr. Stanton-Maxey noted that Mr. Brock had an "approximately 5-cm mass on the left chest under the left nipple." Dr. Stanton-Maxey was unclear whether the mass was a recurrence of Mr. Brock's fibromatosis or merely another soft tissue abnormality. Dr. Stanton-Maxey did not have a copy of either Mr. Brock's previous CT scans or biopsy results. She requested his images for review and ordered a repeat CT scan with IV contrast and explained that if Mr. Brock's mass involved his chest wall, then it would "need to be evaluated by our thoracic surgeons for potential resection." [Dkt. 136-6, ¶ 35; 136-35]. She stated that Mr. Brock reported a significant enlargement of the mass, even over the last few months, which would not be reflected on a CT scan performed in December of 2012. [Dkt. 136-35].

On July 31, 2013, Dr. Wilson received and reviewed Dr. Stanton-Maxey's report, placed a request for Mr. Brock to have a chest CT scan with IV contrast, and placed a request for Mr. Brock to follow up with Dr. Stanton-Maxey after the CT scan was performed. [Dkt. 136-6, ¶ 36; 136-36].

On September 4, 2013, Mr. Brock had a chest CT with IV contrast. According to the radiology report, when compared to the November 20, 2012, CT scan, Mr. Brock's chest mass had increased in size to approximately 7.5 cm x 4.8 cm. [Dkt. 136-6, ¶ 3; 136-37].

On September 12, 2013, Mr. Brock saw Dr. Wilson at the Chronic Care Clinic. Mr. Brock's primary issue that day was his fibromatosis and Dr. Wilson explained that Mr. Brock had a follow up appointment scheduled with Dr. Stanton-Maxey. Dr. Wilson noted that based on the CT on September 4, 2013, the mass increased in size. Mr. Brock "voiced understanding and agreement with [the] treatment plan." [Dkt. 136-6, ¶ 38; 136-38].

On November 19, 2013, Mr. Brock saw Dr. Erik Streib, a general surgeon at Indiana University Medical Center in Indianapolis. Dr. Streib observed a "fairly large subcutaneous mass measuring 8-10 cm in diameter and probably 6 or 8 cm in depth" in Mr. Brock's chest. Dr. Streib recommended a surgical resection and noted that although the mass was not completely fixed to the chest wall, if the resection required "excision of a portion of the chest wall," a thoracic surgeon would need to be involved. [Dkt. 136-6, ¶39; 136-39].

Dr. Streib's report arrived at Terre Haute on January 2, 2014. [Dkt. 136-40]. That same say, Dr. Wilson instructed RN Christopher McCoy to submit the necessary paperwork to have Mr. Brock's surgery approved. [Dkt. 136-6, ¶ 40; 136-40].  The BOP denied Mr. Brock's Tort Claim on January 8, 2014. [Dkt. 136-1].

### D. Surgery

On January 27, 2014, Mr. Brock saw Dr. Wilson at Chronic Care Clinic. [Dkt. 136-6]. Dr. Wilson informed Mr. Brock that his surgery had been approved. [Dkt. 136-6, ¶ 41; 136-41]. On February 14, 2014, Mr. Brock was admitted to Eskenazi Hospital to have his chest mass resected by Dr. Streib. Before the surgery, Dr. Streib noted that the main purpose of the surgery was to decrease Mr. Brock's pain and Mr. Brock was "aware that [a] recurrence [was] likely." [Dkt. 136-6, ¶ 42; 136-42]. Mr. Brock was discharged from Eskenazi Hospital on February 17, 2014. [Dkt. 136-6, ¶ 43; 136-43].

Mr. Brock had a follow up appointment with Dr. Alison Fecher and Dr. Jeffrey Browne at Eskenazi Hospital on February 25, 2014. Dr. Fecher noted that Mr. Brock's pathology report was positive for desmoid tumor but she was still waiting for further analysis to determine the proper course of treatment. [Dkt. 136-6, ¶ 44; 136-44].

On March 25, 2014, Mr. Brock had a follow up appointment with Dr. Gerardo Gomez at Eskenazi Hospital. Dr. Gomez noted that Mr. Brock's case had been discussed at a "tumor conference" and that the best option was for Mr. Brock to follow up with Dr. Daniel Rushing at Indiana University Hospital in Indianapolis. [Dkt. 136-6, ¶ 45; 136-45].

On April 11, 2014, Mr. Brock had a follow up appointment with Dr. Wilson. Dr. Wilson informed Mr. Brock that a request had been placed for him to see Dr. Rushing. [Dkt. 136-6, ¶ 46; 136-46]. On April 16, 2014, Mr. Brock saw Dr. Stephanie Wagner at Indiana University Hospital in Indianapolis.  Dr. Wagner determined that because "further surgical resection would likely not be an option," and because Mr. Brock may have "received radiation to the previously resected area," she would likely recommend "sulindac plus/minus tamoxifen." [Dkt. 136-6, ¶ 47; 136-47]. On June 4, 2014, Mr. Brock saw Dr. Stander at the Chronic Care Clinic. Dr. Stander noted that the plan was to have Mr. Brock follow up with a Terre Haute-based oncologist. [Dkt. 136-6, ¶ 48; 136-48].

On June 10, 2014, Mr. Brock filed his Complaint in this matter. [Dkt. 1].

### E. Expert Opinions

Dr. Richard Freeman, a Board Certified thoracic surgeon employed by the St. Vincent Medical Group in Indianapolis, reviewed Mr. Brock's medical records and opined that the pre-referral evaluation and treatment that Mr. Brock received from BOP Health Services staff members, as well as the pre- and post-operative surgical care administered to Mr. Brock by the BOP Health Services staff, was appropriate and within the standard of care.

Dr. Freeman noted that BOP Health Services staff members evaluated Mr. Brock on multiple occasions, ordered and reviewed appropriate tests, and made appropriate referrals to various outside medical providers based on Mr. Brock's clinical presentation. Dr. Freeman opined

that Mr. Brock's condition was complicated by his medical history, as well as by the prior treatments he had received. Despite Mr. Brock's complex presentation, Dr. Freeman concluded that BOP Health Services staff members consistently arranged appropriate diagnostic testing, consultations, and medical procedures for Mr. Brock. Dr. Freeman saw no evidence of any intentional, or unintentional, delays in scheduling diagnostic tests, consultations, or medical procedures for Mr. Brock. In fact, based on Dr. Freeman's review, the records indicated that the BOP Health Services staff continually and persistently worked to secure the appropriate treatment for Mr. Brock. Dr. Freeman noted that Mr. Brock's fibromatosis was a chronic disease and it will likely recur throughout his life. Mr. Brock's fibromatosis was not, however, caused or exacerbated by the treatment he received from the BOP Health Services staff. Nor was the course of Mr. Brock's disease altered by the care that he received from BOP Health Services staff members. [Dkt. 136-49].

Dr. Gregory Smith, a Board Certified oncologist and internal medicine physician employed by the Community Physician Network in Indianapolis also reviewed Mr. Brock's medical records and opined that the medical care provided by BOP Health Services staff members was timely, appropriate, and within the standard of care. Dr. Smith noted that Mr. Brock had a rare disease that, despite appropriate medical intervention, continued to recur.

He further noted that due to Mr. Brock's history of prior surgical resections, prior chemotherapy, and prior radiation, another surgery would be fraught with danger because there was a significant chance of the surgery resulting in a draining, non-healing wound. Accordingly, Dr. Smith opined that a cautious approach (i.e., watching and waiting to see how the tumor grew) was appropriate. [Dkt. 136-5; 138-5]. Dr. Smith commented that Dr. Wilson had a difficult time finding a surgeon to operate on Mr. Brock because surgeons don't like to operate on this condition.

He opined that surgeons delay and hope the tumor "settles down" . . . "but sometimes it grows big enough that you don't have a choice. It is a judgment call. It is a tough call. I would not want to be a surgeon trying to make it." [Dkt. 151-2, at p. 6].

Dr. Smith stated that Mr. Brock's tumor became aggressive, had grown rapidly, and was causing Mr. Brock pain. [Dkt. 151-2, pp. 9, 10]. Dr. Smith agreed that it should be removed, but cautioned that the risk was causing an open wound that would not heal. [Dkt. 151-2, at p 9]. Although not a surgeon, Dr. Smith opined that if a surgeon wanted to do it, it could have been done "in a couple of weeks," but that no doctors in Indianapolis specialize in surgery on desmoid tumors because they are so rare. [Dkt. 151-2, at p. 9]. Finally, Dr. Smith noted that after Mr. Brock's tumor caused enough symptomatology that a repeat resection was advised, one was performed. [Dkt. 136-5].

### III. Discussion

#### A. Claims against the United States.

The government argues that many of Mr. Brock's claims are time-barred and that he has not supported a claim for negligence under Indiana state law.

##### 1. Claims Prior to June 7, 2011.

The United States argues that any claims that occurred prior to June 7, 2011, are time-barred. The Court agrees. The FTCA provides: "A tort claim against the United States shall forever be barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . ." 28 U.S.C. § 2401(b). Statutes of limitations serve important purposes, including protecting "defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise." *E.Y. ex rel. Wallace v.*

*United States*, 758 F.3d 861, 867 (7th Cir. 2014). As such, any claims occurring prior to two years before the date Mr. Brock filed his Tort Claim Notice on June 7, 2013, are time-barred. This action is limited to any alleged negligent conduct by the defendants that occurred on June 7, 2011, and after.

### 2. Claims after June 7, 2013.

The United States argues that Mr. Brock failed to exhaust his administrative remedies under the FTCA concerning any events that occurred after June 7, 2013, which is the date he filed his Notice of Tort Claim. The Court disagrees.

The applicable regulations provide that a claim is deemed "presented" when a federal agency receives from a claimant an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for property loss, personal injury, or death alleged to have occurred by reason of the incident. 28 C.F.R. § 14.2(a). All that is required is "sufficient notice to enable the agency to investigate the claim." *Palay v. United States*, 349 F.3d 418, 426 (7th Cir. 2003) (internal quotations omitted). Any cause of action fairly implicit in the facts set forth in the Standard Form 95 will be considered a claim that was "presented" to the BOP for purposes of the exhaustion requirement. *Id*. Put another way, if the claim would have been apparent to a "legally sophisticated reader" of the form, then the Court will charge the agency with notice of that claim and deem it to have been exhausted. *Id*. The Court finds that the claim at issue in this case is whether BOP medical staff were negligent in their treatment of Mr. Brock's aggressive fibromatosis which resulted in pain and suffering and for which he seeks money damages.

The United States complains that the only tort claim submitted by Mr. Brock was sent to the BOP on June 7, 2013. Therefore, they argue, any allegedly negligent events that occurred after that date have not been administratively exhausted.

It is plain from the tort claim that Mr. Brock was upset about the medical treatment he received (or failed to receive) for aggressive fibromatosis. The United States' investigator had the opportunity to consider the treatment in its entirety, including the current status of the injury. *See Warrum v. United States*, 427 F.3d 1048, 1050 (7th Cir. 2005) (noting that "the purpose of the FTCA's exhaustion requirement is to facilitate the administrative evaluation of tort claims by the agency whose activity gave rise to the claim and permit settlement of meritorious claims more quickly and without litigation.")(citations omitted). The BOP's response states, "[i]nvestigation of your claim did not reveal you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment." [Dkt. 136-4].

The Court rejects the United States' argument that any negligent events that occurred after June 7, 2013, have not been administratively exhausted and would therefore be a separate alleged act of a government employee distinct from the allegations in his tort claim. The United States will not be permitted to splice the single claim raised in this case—negligent treatment of a medical condition—into multiple claims in an effort to narrow the scope of liability. Mr. Brock's notice of tort claim, with six attached pages describing the alleged negligent treatment he received, [dkt. 136-3], gave the BOP sufficient notice to enable the agency to investigate his claim. Allegations concerning the treatment he received (for the exact same condition raised in the June 7, 2013, notice of tort claim) that occurred after June 7, 2013, were not necessary to put the agency on notice that Mr. Brock was complaining of the treatment he received for aggressive fibromatosis.

### 3. Negligence- Medical Malpractice.

The United States argues that Mr. Brock has not supported a claim for negligence under Indiana state law. The only claim for negligence Mr. Brock alleges in his amended complaint is a medical malpractice claim, where he states the "defendant United States, through their employees, committed negligent and careless acts and omissions, constituting medical malpractice. . . ." [Dkt. 89, p. 3]. He does not state a claim for general negligence.

Where claims arise under the FTCA, government employees are held liable to a claimant "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Here, Indiana's substantive law governs. To show negligence under Indiana law, Mr. Brock must demonstrate (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach. *See Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind.2007); *French v. State Farm Fire & Cas. Co.*, 881 N.E.2d 1031, 1039 (Ind. Ct. App. 2008).

In a medical malpractice case, to show a breach of duty, "expert medical testimony is usually required to determine whether a physician's conduct fell below the applicable standard of care." *Bader v. Johnson*, 732 N.E.2d 1212, 1217–18 (Ind. 2000); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004) ("[U]nder Indiana law a prima facie case in medical malpractice cannot be established without expert medical testimony."). "This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care without the benefit of expert opinion on the ultimate question of breach of duty." *Bader*, 732 N.E.2d at 1217–18. Expert testimony is required unless the defendant's conduct is "understandable without extensive technical input" or "so obviously

16

substandard that one need not possess medical expertise to recognize the breach." *Gipson v. United States*, 631 F.3d 448, 451 (7th Cir. 2011).

Generally, the mere fact that an injury occurred will not give rise to a presumption of negligence under Indiana law. *Narducci v. Tedrow*, 736 N.E.2d 1288, 1292 (Ind. Ct. App. 2000). The United States argues that Mr. Brock has failed to offer evidence from which a reasonable jury could find a breach of the standard of care and that there is no evidence of proximate cause regarding his damages.

To be sure, the government owed Mr. Brock a duty. Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health and safety of a person in custody. *See Sauders v. County of Steuben*, 693 N.E.2d 16, 18 (Ind. 1998); *Johnson v. Bender*, 174 Ind. App. 638, 369 N.E.2d 936, 939 (1977) (finding that a sheriff who was charged with the care and custody of a prisoner had a duty to take reasonable precautions under the circumstances to preserve the life, health, and safety of the prisoner). To survive summary judgment, however, Mr. Brock must demonstrate that the actions or omissions of the BOP employees breached that duty in some way.

The United States argues that Mr. Brock's medical malpractice claim must fail because the care that he received fell within the standard of care. The United States has provided expert medical testimony from two independent experts evidencing that the care Mr. Brock received for his condition was medically appropriate, was within the standard of care, and was not negligent. Mr. Brock argues that the defendants were negligent because of the delay in scheduling the surgery to remove Mr. Brock's desmoid tumor. They argue that even the United States' expert, Dr. Smith, agreed that surgery was the appropriate remedy for aggressive tumors and it should have been scheduled within a couple of weeks. However, that is not what the evidence shows. Moreover, Mr.

Brock has provided no expert testimony to support his malpractice claim. The Court cannot say that the proper course of treatment for Mr. Brock's desmoid tumors is obvious as to be within the understanding of lay people. Expert testimony is therefore required.

Nonetheless, the evidence shows there was no breach of duty because there was no delay in scheduling Mr. Brock's surgery. Mr. Brock was recommended for surgery for the first time on November 19, 2013, by Dr. Streib after a CT with IV contrast text, ordered on July 31, 2013, showed that his tumor had grown to approximately 7.5 cm x 4.8 cm. [Dkt. 136-39]. Dr. Streib's report arrived at Terre Haute on January 2, 2014. [Dkt. 136-40]. That same day, Dr. Wilson instructed RN Christopher McCoy to submit the necessary paperwork to have Mr. Brock's surgery approved. [Dkt. 136-6, ¶40; 136-40]. Mr. Brock had surgery on February 14, 2014.

Dr. Smith stated that due to Mr. Brock's history of prior surgical resections, prior chemotherapy, and prior radiation, another surgery would be fraught with danger because there was a significant chance of the surgery resulting in a draining, non-healing wound. Accordingly, Dr. Smith, like Dr. Freeman, opined that a cautious approach (i.e., watching and waiting to see how the tumor grew) was appropriate. [Dkt. 136-5; 138-5]. Dr. Smith's affidavit and his deposition, when read in its entirety, simply cannot be understood in a way to support Mr. Brock's argument that the United States was negligent in delaying the scheduling of Mr. Brock's surgery. Dr. Smith made it clear that Mr. Brock's surgery would be difficult and any reasonable surgeon would wait and see before performing surgery on a patient that had had a pervious surgery. Finally, Dr. Smith stated that after Mr. Brock's tumor caused enough symptomatology that a repeat resection was advised, one was performed. [Dkt. 136-5].

Moreover, Mr. Brock did not present a medical expert to support his claim that any delay in scheduling Mr. Brock's surgery was negligent. Dr. Streib was the first doctor to recommend

18

surgery. Prior to that, the doctors were monitoring Mr. Brock's tumor. Mr. Brock's argument that multiple doctors recommended surgery well before November of 2013, is not supported by the record. For example, Mr. Brock claims that Dr. Smith affirmed Dr. Bailey's opinion that the only appropriate treatment for aggressive fibromatosis was surgery. However, Dr. Smith stated, "if the cyst was *de novo* absolutely I would agree. But again, what you risk is an open wound that does not heal." [Dkt. 151-2, at p. 9]. (Emphasis added).

And contrary to Mr. Brocks' assertions, two physicians did not state that Mr. Brock's surgery should have taken place one or two years before it did. On August 8, 2012, BOP physician Dr. Tom Bailey saw Mr. Brock to evaluate his chest mass.  Dr. Bailey noted that "over . . . the last 5 months [Mr. Brock] has developed another mass which has rapidly grown in size just below the site of the last tumor." Dr. Bailey noted the mass will require excision and should be *removed as soon as practicable*. [Dkt. 136-6, ¶18; 136-17]. (Emphasis added).

Additionally, it was Mr. Brock that stated to PA Jastillano that Dr. Meldrum told him that he would "need another surgery in the near future." [Dkt. 136-6, ¶12; 136-11]. The medical records do not support the assertion that Dr. Meldrum told Mr. Brock he would need another surgery in the near future. [Dkt. 136-11].

Finally, with respect to Dr. Smith's statement that surgery should have been scheduled within 1-2 weeks, his actual statements were, if a surgeon wanted to do it, it could have been done "in a couple of weeks." [Dkt. 151-2, at p. 9].

Here, the evidence shows that once surgery was recommended, Dr. Wilson immediately instructed that it be scheduled with the surgeons at Eskenazi. The defendant did not breach a duty by delaying in scheduling Mr. Brock's surgery. Because Mr. Brock has not provided any expert

testimony to show a genuine issue of material fact on this point, the defendant United States'
motion for summary judgment [Dkt. 136] is **granted**.

### B. Claims Against the Individual Defendants.

Defendants Allen, Jastillano, Jones, and Wilson argue that a judgment against Mr. Brock
on his FTCA claims bars his *Bivens* claims.  28 U.S.C. § 2676 provides: "The judgment in any
action under section 1346(b) of this title shall constitute a complete bar to any action by the
claimant, by reason of the same subject matter, against the employee of the government whose act
or omission gave rise to the claim." This statute is known as the judgment bar which "preserves
sovereign immunity by protecting the United States from defending against separate lawsuits
arising from the same conduct." *Williams v. Fleming*, 597 F.3d 820, 823 (7th Cir. 2010) (abrogated
by *Simmons v. Himmelreich*, 136 S. Ct. 1843 (2016) on other grounds finding the exceptions found
in 28 U.S.C. § 2680 (which are not present in this action) do not act as a judgment bar.).

A judgment is a prerequisite to the operation of the statute. *Id.* at 822. However, it does not
matter whether judgment on the FTCA claim is entered before, simultaneously with, or after
judgment on the remaining claim against the government employees. *See Manning v. United
States*, 546 F.3d 430 (7th Cir. 2008) (affirming district court's decision to vacate jury verdict of
$6.5 million in damages for plaintiff on his *Bivens* claim where the United States was subsequently
granted summary judgment on the related FTCA claim.).

Mr. Brock does not address the argument that his *Bivens* claim is not precluded by the
FTCA judgment bar. Accordingly, because Mr. Brock's FTCA claims have been dismissed, his
*Bivens* claims must also be dismissed. The individual defendants' motion for summary judgment
[Dkt. 138] is **granted**.

## IV. Conclusion

The motions for summary judgment filed by the United States and the individual

defendants [Dkts. 136, 138] are **granted**.  Judgment consistent with this ruling shall now issue.

**IT IS SO ORDERED**.


Date: 3/9/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana


Distribution:

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com

Mark M. Holdridge
HUME SMITH GEDDES GREEN & SIMMONS
mholdridge@humesmith.com

William David Beyers
HUME SMITH GEDDES GREEN & SIMMONS
bbeyers@humesmith.com

Craig W. Wiley
JACKSON LEWIS P.C. - Indianapolis
craig.wiley@jacksonlewis.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov